Floridan Hotel Operators, Inc. v. Commissioner.
Floridan Hotel Operators, Inc. v. Commissioner
Docket Nos. 24426, 27033.
United States Tax Court
1953 Tax Ct. Memo LEXIS 368; 12 T.C.M. (CCH) 136; T.C.M. (RIA) 53050; February 16, 1953
LeRoy Allen, Esq., Henry Carrington, Esq., and Martin L. Wilkins, C.P.A., for the petitioner. Newman A. Townsend, Jr., Esq., for the respondent. TURNER Memorandum Findings of Fact and Opinion TURNER, Judge: The respondent has determined deficiencies in income tax, declared value excess profits tax and excess profits tax against the petitioner as follows: Declared Value
Docket
Fiscal Year
Income
Excess
Excess
No.
Ended
Tax
Profits Tax
Profits Tax
24426
March 31, 1944
$ 432.85
$19,389.86
$126,745.14
March 31, 1945
1,674.68
18,667.42
111,898.93
March 31, 1946
10,859.01
10,354.23
54,001.69
27033
March 31, 1947
17,000.90
The deficiencies result from the disallowance by the respondent of amounts deducted by the petitioner on its returns for the years involved *369 as rent for the hotel properties operated by it. The question is whether the full amounts so deducted by the petitioner on its returns were rent, as the petitioner claims, and therefore deductible in computing its net income. These proceedings were heard by Ezekiel R. Stegall, who was designated as a Commissioner for that purpose pursuant to section 1114 of the Internal Revenue Code and Rule 48 of the Court's Rules of Practice. Findings of Fact The proposed findings of the Commissioner, heretofore filed October 18, 1951, and served upon the parties, are hereby found and adopted as findings of fact herein. They are as follows: 1. A portion of the facts were stipulated and are found as stipulated. 2. The petitioner is a Florida corporation organized in April 1943, and has its principal place of business at Tampa. It filed its income and excess profits tax returns for the fiscal years ended March 31, 1944, March 31, 1945, March 31, 1946, and March 31, 1947, with the collector for the district of Florida. The petitioner's books of account were kept, and its income tax returns were filed, on the accrual basis. 3. The Floridan Hotel, sometimes hereafter *370 referred to as the Floridan, is located at the intersection of Cass Street and Florida Avenue, in Tampa. It was constructed in 1925 and 1926, at a cost of approximately $1,500,000. With the collapse of the Florida land boom in 1927, hotels in Tampa encountered financial difficulties and at one time the Floridan was placed in receivership. About 1930, the Floridan was acquired by Florida Collier Coast Hotels, Inc., which corporation after a reorganization in 1936 became Collier Florida Coast Hotels, Inc., sometimes hereafter referred to as Collier Florida. Collier Florida was owned and controlled by Barron G. Collier who died in 1939. After his death his interest in Collier Florida was acquired by Jefferson Standard Life Insurance Company, sometimes hereafter referred to as Jefferson Standard, Greensboro, North Carolina. 4. Prior to and on April 1, 1943, Collier Florida owned and operated several hotels in various Florida cities. In addition to the Floridan it owned and operated the Tampa Terrace Hotel also in Tampa. George H. Mason was president of Collier Florida, manager of the Tampa Terrace Hotel and general manager of all the other hotels operated by the corporation. James B. *371 Pickard, who had been with the Collier organization for a number of years, was a director in Colier Florida and was manager of the Floridan, a position he had held since 1932. 5. Early in 1943 Jefferson Standard caused Collier Florida to begin selling its hotels. About October 1943, Collier Florida was dissolved and all its assets transferred to Jefferson Standard. 6. The Floridan is an 18-story structure having, in 1943, approximately 345 rentable rooms with bath and, at present, approximately 360 rentable rooms with bath. The foundation for the building is concrete and piling and the walls are brick on steel framework. The roof is composition. The interior walls and ceilings are plaster. The window and door frames are both wood and steel. The first floor and mezzanine contain space for a lobby, a coffee shop, a cocktail lounge and a barber shop. There are utility rooms and toilets in the basement. There are one freight and three passenger elevators. The building contains no space on the street level which could be rented for stores or shops. 7. For a period of about ten years prior to 1940 the hotel business in the Tampa area was not generally profitable. However, conditions *372 began to improve in 1940 when defense activities were undertaken in the area. By 1943 two shipyards and several military installations had been opened in or near the city and economic conditions in general and the hotel business in particular were unusually good. The demand for rooms was such that the hotels in the city were operating at or near full occupancy. 8. The following is a statement of the operating results of the Floridan for the periods indicated: Net Operating
Period
income or loss
1939
($29,806.02)
January 1, 1940-October 31, 1940
$ 24,032.13
Year ended October 31, 1941
45,647.83
Year ended October 31, 1942
107,845.13
November 1, 1942-April 30, 1943
94,861.79
9. Early in 1943 Oscar Ayala, a real estate broker in Tampa, was handling some small real estate matters for Paul H. Smith and was also acting as agent for Collier Florida. He approached Smith and advised him that the Floridan was for sale at $800,000 but probably could be purchased for $750,000 with a down payment of $250,000. Smith had previously lost $100,000 on a hotel investment but after looking into Ayala's proposition concluded that while it might have interesting possibilities *373 it involved a larger commitment than he was willing to undertake alone. He advised Ayala accordingly and suggested that he contact J. L. Cone about the matter which Ayala did. Smith and Cone brought the proposition to the attention of J. D. Manly, S. B. Brinson and one McLeod. Manly became interested in the proposition but Brinson and McLeod promptly turned it down. Smith, Cone and Manly held several conferences with Ayala, George H. Mason and representatives of Jefferson Standard at which the purchase of the Floridan was discussed. After having obtained the hotel's operating record back to 1930 and learning that it had operated at a loss for several years during that period and after having been advised that it was currently operating at a profit of approximately $25,000 a month they consulted their tax advisers and attorneys. Upon being advised that the high tax rates applicable to their individual incomes would preclude them from paying, within the next few years, for the Floridan out of the anticipated income therefrom and feeling that after the war a new hotel might be erected in Tampa which would be detrimental to Floridan's business, Smith, Cone and Manly abandoned the idea *374 of purchasing the property and broke off negotiations with Ayala. 10. Paul H. Smith and J. L. Cone reside in Tampa and J. D. Manly resides in Leesburg, Florida. For a number of years they have engaged in business as construction contractors and each has been and is head of his own separate organization. Smith's business is known as Paul H. Smith Construction Company and consists principally of building construction. Cone's business consists of the construction of roads, bridges, sewers and paving and the manufacture of ready-mixed concrete, concrete blocks and other concrete products. Among the corporations owned or controlled by Cone and his immediate family or in which he was interested were Cone Brothers Contracting Company and Tampa Sand and Material Company. Manly's business is primarily that of road construction and is conducted under the name of J. D. Manly Construction Company. 11. For several years prior to 1943 Smith, Cone and Manly have been personal friends. Each has owned stock in one or more corporations in which one or both of the others were also stockholders. Prior to and during the period of defense activity incident to World War II, Cone and Manly either personally *375 or through corporations, participated jointly in a number of construction projects and Smith participated with them in a $9,000,000 contract for the erection of a Navy facility at Melbourne, Florida. Several of the projects, including that at Melbourne, were under construction in 1943. 12. About two weeks after Smith, Cone and Manly broke off negotiations with Ayala for the purchase of the Fioridan he again approached Smith informing him that Jefferson Standard was extremely desirous that the property be disposed of while business conditions were good and that the property might be purchased for less than it was previously offered. After discussing the matter, Smith and Ayala met at lunch with Cone and Mason during which someone suggested that a purchase of the Floridan might be practicable if it could be made by a group of ten or fifteen persons whose incomes were in low tax brackets. After again consulting their tax advisers and attorneys, Smith, Cone and Manly decided that the purchase would be a desirable one for a group of persons with incomes in low tax brackets and that they would contact their friends, relatives and business associates to see if a sufficient number would *376 be interested in making the purchase. 13. Smith talked to his wife, his daughter, Marjorie S. Green, his sons, Paul, Jr. and Ernest, and a long-time friend, Jim Freeman, about purchasing interests in the Floridan. Of that number only Smith's daughter and two sons were interested. Cone talked to his twin sons, Julian L., Jr. and C.W.; to T. E. Dressler, an employee of Cone and of corporations which Cone controlled or in which he was interested; to Fred H. Poe, Cone's brother-in-law and an employee of a corporation owned and controlled by Cone; and to S. L. Flom and D. F. Taylor of Tampa, who were the principal officers and stockholders of the Florida Steel Products Company with which Cone had transacted a considerable amount of business for many years and with which the Paul H. Smith Construction Company had transacted a substantial volume of business. Cone's sons were interested in acquiring interests. Dressler, Poe, Flom and Taylor, after considering the matter, advised that they were not interested personally but their wives, Mary, Zula B., Julia M., and Maud W., respectively, were interested and that they would be glad to help their wives to acquire interests. Manly contacted *377 his daughter, Ella Maude Gray, her husband, J. Ashton Gray, and E. M. Merrell, a former employee and close friend who lived in Leesburg. Manly's daughter, her husband, and Merrell's wife, Lillian M., were interested in purchasing interests. 14. With a view to ascertaining the lowest price at which, and the most favorable terms on which, the Floridan would be sold Smith and Cone held further conferences with Ayala, Mason and officials of Jefferson Standard. The discussions and negotiations during these conferences were conducted on the basis that Smith, Cone and Manly were not interested in the purchase of the Floridan for themselves personally but were acting on behalf of members of their families and associates. 15. After the terms and conditions on which Collier Florida and Jefferson Standard had concluded to sell the Floridan had been arrived at, an attorney for them prepared a proposed sales contract embodying such terms and conditions and on or about March 19, 1943, submitted it to Smith and Cone for signing as purchasing trustees. The proposed contract provided, among other things, for a sales price of $675,000 payable $200,000 upon delivery of deed, $120,000 payable in twelve *378 monthly installments of $10,000 each beginning May 1, 1943, $195,000 payable in 39 quarterly installments of $5,000 each beginning July 1, 1944, and ending January 1, 1954, and $160,000 payable on or before April 1, 1954, with the unpaid deferred installments to bear interest at 4 per cent per annum payable semi-annually on October 1 and April 1 of each year. The contract provided that Collier Florida would turn over and deliver the hotel to the purchasers as of April 1, 1943, and was to assume responsibility for the payment of all bills incurred in its operation prior to April 1, 1943, and the purchasers were to assume responsibility for the payment of all liabilities incurred thereafter in its operation. The contract also recited the simultaneous payment by the purchasers of the sum of $20,000 which was to be retained by the seller as liquidated damages in event the purchasers failed or refused to purchase the property but otherwise to be credited on the cash payment of $200,000. Smith and Cone informed the attorney that they were not buying the hotel and declined to sign the proposed contract. Thereupon Collier Florida and Jefferson Standard decided not to require the cash payment *379 of $20,000 and tie up the property with such a payment but to allow the prospective purchasers to close a purchase within 60 days on the terms set out in the proposed contract and that if the prospective purchasers failed to do so they would be without any right or interest with respect to the property. On that basis Mason, Smith and Cone on March 19, 1943, initialed a recital to the effect that the proposed sales contract was a memorandum of the proposed sale set forth therein and was to be used as a basis for closing the same, as near to April 1, 1943, as possible, and that no deposit of $20,000 or other sum had been made. 16. The tax advisers and attorneys consulted by Cone and Smith during negotiations to purchase the Floridan were Martin L. Wilkins, C.P.A., Alfred E. Collins, C.P.A., Morris White, Attorney, and Calvin Johnson, Attorney, all of Tampa. In addition to Wilkins, Manly consulted accountants in Leesburg and Jacksonville about the matter. After a decision had been reached to purchase the property, the details of the transaction were worked out by Wilkins, Collins and White. Wilkins was employed at Cone's suggestion and White and Collins were employed at the suggestion *380 of Smith. 17. By a deed and bill of sale, both dated April 7, 1943, Collier Florida conveyed the Floridan (land and building), together with certain furniture, fixtures, equipment and other personal property, to the 12 persons heretofore mentioned as interested in purchasing interests therein, namely, Marjorie S. Green, Paul Smith, Jr., Ernest M. Smith, Julian L. Cone, Jr., C. W. Cone, Mary Dressler, Zula B. Poe, Julia M. Flom, Maud W. Taylor, J. Ashton Gray, Ella Maude Gray and Lillian W. Merrell (an undivided one-twelfth part to each person with title to be held as tenants in common) for a total consideration of $675,000. On April 17, 1943, the deed was acknowledged by Collier Florida and on May 10, 1943, was recorded in the public records of Hillsborough County, Florida. 18. Although the purchase of the Floridan was completed on May 10, 1943, it was effective as of April 1, 1943. At the closing the consideration of $675,000 was discharged by a cash payment of $200,000 and the delivery of a 4 per cent interest bearing note for $475,000 dated April 7, 1943, signed by the 12 persons to whom the property had been conveyed, and hereafter sometimes referred to as the owners. The note *381 was secured by a mortgage dated April 7, 1943, executed by the owners on the hotel and the furniture, fixtures and equipment located therein. The note was payable in four quarterly installments of $30,000 each beginning July 1, 1943, and thereafter in 39 quarterly installments of $5,000 each beginning July 1, 1944, and continuing to and including January 1, 1954, and the balance of $160,000 was payable on April 1, 1954. The note also permitted anticipation of payment. Both the note and the mortgage contained a provision limiting the mortgagee's right to collection on the note or the mortgage solely to the property covered by the mortage and prohibiting the recovery of a personal judgment or deficiency decree thereunder against the makers and mortgagors or any of them, their heirs or personal representatives. The latter provision was inserted at the instance of Smith, Cone and Manly because the venture was regarded as speculative and it was considered desirable to limit the liability of the owners so that in event operations were not successful their loss would be limited to what had been paid. 19. Marjorie S. Green married Alonzo F. Green in 1940 shortly after he entered the Army *382 and before she completed her last year in college. On April 1, 1943, she and her husband were living at Fort Leavenworth, Kansas, where he was stationed with the Army. Some time during the first three months of 1943 she visited her parents for a short time in Tampa and after her husband went overseas in August, 1944, she returned to Tampa to live with them. Green was released from the military service about September, 1945, and since that time he and Marjorie have made their home in Gainesville, Florida. 20. On April 1, 1943, Paul Smith, Jr. was 22 years of age. During the preceding March he was called to active duty in the Army. Prior to that time he was a student at Georgia School of Technology, Atlanta, Georgia. After spending a week at an induction center near Atlanta he returned to Georgia School of Technology and remained there on an Army Training Program until about July 5, 1943. He served in the Army until about March, 1946, and was overseas from April, 1944, until March, 1946. 21. Ernest Smith was 18 years of age on April 1, 1943, was living with his parents in Tampa and attending the University of Tampa. About January or February, 1943, arrangements had been made for *383 him to go to South America as treasurer of the South Atlantic Construction Company, a corporation controlled by his father, and engaged in construction work in Brazil. About that time, and to enable him to be legally capable of discharging his duties in the prospective employment, his parents began proceedings for the removal of his disability as a minor. On April 5, 1943, such disability was removed by order of the Circuit Court of Hillsborough County, Florida. From June, 1943, until October, 1943, he was employed in South America by the South Atlantic Construction Company. Thereafter he returned to Tampa where he remained until February, 1944, when he entered the Army. He remained in the Army until October 15, 1945, but did not go overseas. He was stationed at various points in the United States and at one time spent about nine months at Moultrie, Georgia. 22. In 1943 and afterwards the father of Marjorie S. Green, Paul Smith, Jr., and Ernest Smith held powers of attorney from them under which on various occasions and on various business matters, including matters relating to the Floridan, he acted for them while they were away from Tampa. 23. Julian L. Cone, Jr., and C. W. Cone *384 were 21 years of age on April 1, 1943. They graduated from the University of Florida in 1941 and about two weeks afterwards began residing about four days a week on a large farm near Plant City, Florida, and living the remainder of their time with their parents. The farm, part of which is in trust, was a gift to them from their father and was devoted to cattle raising and citrus groves. 24. J. Ashton Gray entered the Army on February 5, 1941, and on April 1, 1943, was stationed at Oakland, California, where he had been for about five months previously. His wife, Ella Maude, was residing there with him. He served in the Army at various points in the United States until 1946 when he was released. Thereupon he and his wife returned to Leesburg to live. Ella Maude married Gray shortly after she finished college. 25. The 12 owners of the Floridan took no part in the negotiations with the officials of Jefferson Standard about the purchase of the property. Nor did they attend or participate in the meetings at which Smith, Cone and Manly discussed the acquisition of the property with their accountants and attorneys. Negotiations leading to the purchase of the property were conducted principally *385 by Smith and Cone and to some extent by Manly. 26. The note and mortgage given by the 12 owners were forwarded by mail for execution to parties who were outside of Florida. Marjorie S. Green executed them in Kansas, Paul Smith, Jr., in Georgia and J. Ashton and Ella Maude Gray in California. 27. The initial cash payment of $200,000 made as part of the consideration for the conveyance of the Floridan to the 12 owners was raised as follows: (a) Paul Smith, Jr., Ernest Smith and Marjorie S. Green (joined by her husband, Alonzo F. Green), each executed notes in the amount of $17,000 to the Exchange National Bank, Tampa, Florida, and upon such notes each borrowed $17,000 from the bank. The three notes were secured by United States Government bonds which belonged to and were furnished by their father, Paul H. Smith. The funds so borrowed were deposited in the accounts of Paul Smith, Jr., Ernest Smith, and Marjorie S. Green and Alonzo F. Green (the latter two having a joint account) at the same bank. From their respective accounts each withdrew $16,666.66 or a total of $49,999.98 toward the $200,000 cash payment. Paul H. Smith arranged the foregoing loans for his children. However, *386 each of the children's assets, arising from gifts previously made by him to them and represented by various investments and loans, were of a value substantially greater in amount than the $17,000 each borrowed for the Floridan transaction. (b) J. L. Cone applied $33,333.34 on behalf of his sons, Julian L. Jr. and C. W. Cone, toward the $200,000 cash payment. He treated such application as a gift to his sons and so reported it in the gift tax return filed by him for 1943. (c) On or about May 10, 1943, J. Ashton Gray and Ella Maude Gray borrowed $25,000 from the First National Bank at Leesburg, Florida, upon their personal note which was secured by United States Government bonds belonging to and furnished by Mrs. Gray's father, J. D. Manly. On or about the same date, Lillian W. Merrell and her husband, E. M. Merrell, also borrowed $25,000 from the First National Bank at Leesburg upon their personal note which was secured by United States Government bonds belonging to and furnished by J. D. Manly. From the proceeds of these two loans the sum of $50,000 was applied on behalf of J. Ashton Gray, Ella Maude Gray and Lillian W. Merrell toward the $200,000 cash payment. Manly was an officer *387 or director of the bank and arranged for the loans to the Grays and Merrells. The two loans in equal amounts were necessary to raise the needed funds because the limitations under which the bank operated did not permit it to loan more than $25,000 to a man and wife. A portion of the funds borrowed by the Merrells sufficient to make payment with respect to their two interests were used by the Grays who executed and delivered to the Merrells a note for about $8,000. (d) T. E. Dressler on behalf of his wife, Mary Dressler, applied $16,666.68 toward the $200,000 cash payment. Dressler's employer, J. L. Cone, assisted him in raising the money. Dressler treated the transaction as a gift to his wife and so reported it in the gift tax return filed by him in 1943. (e) On or about May 10, 1943, Fred H. Poe borrowed $15,000 from the Exchange National Bank upon his personal note endorsed by his brother-in-law, J. L. Cone. From the proceeds of this loan and other money in his possession Poe on behalf of his wife, Zula B. Poe, applied $16,666.66 toward the $200,000 cash payment. Poe treated the transaction as a gift to his wife and so reported it in the gift tax return filed by him for 1943. *388 (f) On or about May 10, 1943, S. L. Flom deposited $17,000 in the checking account of his wife, Julia M. Flom, at the Exchange National Bank. From this account she withdrew $16,666.67 and applied it toward the $200,000 cash payment. In 1943 Flom gave $12,500 of the $17,000 to his wife and so reported it in the gift tax return filed by him for 1943. The remaining $4,500 was regarded as a loan until 1946 when he gave her that amount and additional cash, the total of which he reported in the gift tax return filed by him for 1946. (g) On or about May 10, 1943, D. F. Taylor deposited $17,000 in the checking account of his wife, Maud W. Taylor, at the First National Bank in Tampa. From this account she withdrew $16,666.67 and applied it toward the $200,000 cash payment. In 1943 Taylor gave $12,500 of the $17,000 to his wife and so reported it in the gift tax return filed by him for 1943. The remaining $4,500 was regarded as a loan until 1946 when he gave her that amount and additional cash, the total of which he reported in the gift tax return filed by him for 1946. 28. At the time of the negotiations preceding the purchase of the Floridan James B. Pickard had been manager of the *389 hotel for more than 10 years and had been in the hotel business about 22 years. During the negotiations Smith, Cone and Manly found that under Pickard the hotel was being well managed and operated and concluded that the retention of his services to the hotel would be desirable in event of its purchase. During the negotiations the officials of Jefferson Standard and Collier Florida agreed to release Pickard to continue with the Floridan, if he desired, in case Smith, Cone and Manly could arrange for a purchase of the hotel. 29. After it was determined who the purchasers of the hotel would be and while the necessary documents were being prepared and executed Smith, Cone and Manly conferred with their tax advisers and attorneys about a plan for operating the hotel. The advisers first suggested that a hotel operating company, which had formerly operated another hotel in Tampa, be engaged to operate the Floridan. This was rejected because Smith, Cone and Manly considered that Pickard had made a good record in operating the Floridan and they wished to work out a plan whereby he would continue to be manager. In discussions with such of the owners as were available, consideration was given *390 to various plans including one for the owners to form a corporation with a capital sufficient to provide the funds necessary for operation and employ Pickard as manager. Smith recommended that the owners operate the hotel through a committee from their number with Pickard as manager. The attorneys and accountants advised against the latter plan. After several plans had been considered it was finally determined that a corporation should be formed in which Pickard and husbands or parents of the owners would be stockholders and to which corporation the owners would turn over the hotel for management and operation. The reason for this arrangement was that the owners were widely scattered and in most instances without business experience and this plan would utilize the services of Smith and Cone, who were successful businessmen, as well as the services of other representatives of the owners, in a supervisory role as a check on Pickard's management of the hotel. Smith and Cone attended all meetings with their tax advisers and attorneys at which operating plans were discussed and made, and on some occasions Manly, Flom and Taylor were also present. None of the owners participated in these *391 meetings. 30. On April 21, 1943, certificate of incorporation of Floridan Hotel Operators, Inc., the petitioner herein, was issued and corporate organization was effected on April 30, 1943. In organizing the petitioner officers and directors were elected as follows: Officers
Directors
Paul H. Smith, President
Paul H. Smith
J. D. Manly, Vice President
J. D. Manly
J. B. Pickard, Secretary
D. F. Taylor
J. L. Cone, Treasurer
J. L. Cone
S. L. Flom, Asst. Sec. & Treas.
S. L. Flom The foregoing officers and directors were re-elected each year through the fiscal year ended March 31, 1950. At the meeting held on April 30, 1943, the board of directors elected an executive committee composed of Smith, Cone and Taylor and authorized it to act for the board of directors when the latter was not in session. While the membership of the committee has varied over the period down to March 31, 1950, Smith and Cone were reappointed from year to year. The executive committee held no formal meetings but usually exercised its functions at informal luncheons with Pickard at the Floridan. 31. The petitioner was authorized to and did issue 180 shares of capital stock for which *392 $18,000 was subscribed and paid. The stock was originally issued as follows: No. of Shares
Paul H. Smith
35
J. L. Cone
30
J. D. Manly
40
J. B. Pickard
10
S. B. Brinson
10
Paul A. Lassiter
10
J. R. Wilson
15
F. S. Bggs
30
Total
180 All the foregoing parties provided and paid in to the petitioner $100 a share for the stock issued to them except the last named three. Manly paid in $1,000 for the 10 shares issued to Lassiter, an acquaintance of his. Because of a new business connection formed by Lassiter shortly after the formation of the petitioner he assigned the stock to Manly. Smith provided all or part of the $1,500 for the 15 shares issued to Wilson, an employee and long-time friend. Later Wilson repaid Smith. S. L. Flom and D. F. Taylor paid in $1,500 each or a total of $3,000 for the 30 shares issued in two certificates to Boggs who lived in Jacksonville and was a close friend and business associate of theirs. Boggs gave them his unsecured personal notes for the advances. In 1946, nothing having been paid on the notes and because of illness in his family, Boggs requested them to accept a transfer of the stock to them and cancel the notes, which *393 was done. On April 16, 1946, the transfer of the stock was made on the records of the petitioner. The petitioner's stock continued to be held as set forth above through the period ending March 3, 1950. 32. On or about May 8, 1943, the owners of the Floridan and the petitioner executed a written instrument, sometimes hereafter referred to as a lease, which provides as follows: "THIS LEASE Made and entered into this the 8th day of May, 1943, but effective as of the 1st day of April, 1943, by and between Marjorie Smith Green [et al.] * * * parties of the first part, hereinafter referred to as Lessors, which term shall include and refer to each of the parties of the first part, more than one of them, or all of them, as the context may permit or require, and Floridan Hotel Operators, Inc., a corporation organized and existing under the laws of the State of Florida, having its principal place of business in the City of Tampa, Hillsborough County, Florida, hereinafter called the Lessee, "WITNESSETH: "WHEREAS, the said Marjorie Smith Green [et al.] * * * are the owners, as tenants in common, of the premises and personal property hereafter particularly described, each being respectively *394 the owner of an undivided one-twelfth (1/12) part of interest therein, and "WHEREAS, said Lessors, according to their several estates and interests, and each of said Lessors so far as concerns his or her own share, estate and interest, have agreed to let and lease unto the Lessee, and Lessee has agreed to rent of and from said Lessors the said premises and personal property to be particularly described hereafter, and the Lessee has agreed to operate the same as a hotel. "NOW, THEREFORE, in consideration of the rents agreed to be paid by the Lessee as hereinafter set forth and of the covenants, agreements and conditions hereinafter contained on the part of the Lessee to be kept, done and performed, the said Lessors, according to their several estates and interests have leased and let and each of the above named Lessors separately so far only as regards his or her own respective share, estate and interest in and to the demised premises and personal property, has leased and let unto the Lessee those certain premises and the personal property located therein situated in the City of Tampa, Hillsborough County, Florida, more particularly described as follows, to wit: "[Here appears *395 a legal description of the Floridan] also "All of the goods, chattels, personal property, furniture, furnishings, fixtures, machinery and equipment now installed or located in the building known as the Floridan Hotel situated upon the above described land in the City of Tampa, Hillsborough County, Florida, more particularly described and set forth on Schedule 'A' hereto attached and made a part hereof as fully as if copied at length herein, and also "All other furnishings, fixtures and equipment contained in said hotel owned by the Lessors herein. "The premises hereinabove described are hereinafter referred to as 'leased premises' and the personal property hereinabove described is hereinafter referred to as 'personal' property. "TO HAVE AND TO HOLD the above described leased premises and personal property unto the said Lessee for the full term of twelve (12) months from and including the 1st day of April, 1943, unto and including the 31st day of March, 1944, (unless sooner terminated under the provisions of this lease), the said Lessee yielding and paying to the Lessors as rent therefor as hereinafter provided. "The Lessee, in consideration of the leasing of said premises *396 and personal property, does hereby covenant and agree to and with the said Lessors, and with each of them severally, and this lease is made upon the terms and conditions, as follows, to-wit: "1. That the Lessee shall operate the leased premises and personal property continuously during the term of this lease as an operating hotel property and that it will continuously during the term hereof conduct the said hotel business in a proper and suitable manner so as to continue and enhance the value of the running business of said hotel as an operating property heretofore and now trading under the name of the Floridan Hotel, and that it will at all times conduct said hotel operating property as a high-class commercial and tourist hotel according to the best conventions and usages known in the hotel business, and that it will do no act which will detract from or tend to destroy the value of the good will of said operating hotel business. "2. That the Lessee will pay unto the Lessors as rental for the leased premises and personal property each month during the term of this lease an amount equivalent to a percentage of its 'gross profit on sales' derived from its operations of said premises *397 and personal property as an operating hotel, said percentage of 'gross profit on sales' being upon a sliding scale and to be computed as follows, to wit: "(a) The percentage of 'gross profit on sales' to be used as an equivalent of the rent to be paid each month shall be based upon and in conformity with 'Room Occupancy' in said hotel during the month in accordance with the following scale or chart: Percentage of
Room Occupancy
Gross Profit
during Month
Payable as Rental
1 to 5000
38%
5001 to 5500
40
5501 to 6000
42
6001 to 6500
44
6501 to 7000
46
7001 to 7500
48
7501 to 8000
50
8001 to 8500
51
8501 to 9000
52
9001 to 9500
53
9501 and over
54
"(b) 'Gross Profit on Sales' for any month shall be taken to mean: (1) The entire amount collected as Room Rental, and (2) The amount received from Sales of Food and Beverages or other merchandise held for sale, less the cost of such food, beverages and merchandise sold, and (3) The amount received from Laundry and Barber Shop revenues, less the cost of laundry service and incidental supplies of the Barber Shop. (4) The excess of telephone charges over the cost of Service rendered. "(c)Room *398 Occupancy for any given month shall be taken to mean the number of rooms per day occupied during the month by transient guests on a paying basis, and where rooms are occupied by permanent guests paying rent on a monthly basis, such room or rooms shall be credited with one-fourth (1/4) of a day's occupancy for each actual day so occupied during the month. For example - Days in
Room
Rooms
Month
Occupancy
Transient 231 at
31
7161
Permanent 115 at
31 - 3545
at 1/4
861
Total Room Occupancy for the Month
8022
"(d)As soon as possible after the last day of each month during the term of this lease and in no event not later than the 10th day after the last day of each month the Lessee shall, as hereinabove set forth, compute the rental due for the preceding month and shall prepare a statement thereof, setting forth the factors upon which said amount is based and shall forward said statement to the Lessors and to their designated auditors and accountants. "(e) At the time of the delivery of the statement required in Paragraph 'd' above, and on or before the 10th day after the end of any month during the term of this lease, the Lessee shall pay to the *399 Lessors the monthly installment of rent for the month just passed as hereinabove ascertained. "(f) The Lessee shall install and keep during the term of this lease a suitable set of books agreeable to the Lessors and in keeping with modern bookkeeping methods wherein the operations of said hotel shall be reflected and full information and entries showing the factors whereby the monthly rental may be ascertained in accordance with the provisions hereinabove set forth; said books and records shall be open at all times during business hours for the inspection of the Lessors or their duly authorized agents and accountants who shall have the privilege of inspecting the same and of making an audit or audits thereof from time to time as may be desired, and if it be ascertained that additional rent is due by Lessee, such additional rent shall be immediately paid. "3. That in addition to the rentals hereinabove agreed to be paid, the Lessee agrees to pay all bills and charges for water, gas and electricity used or consumed on the leased premises and all charges for telegraph, telephones and telephone service, including long distance tolls, incurred by the Lessee, its tenants and guests, *400 promptly as the same or any of same shall become due and payable and the Lessors shall in no manner be responsible for the payment of same or any of same, nor shall the leased premises and personal property be subject to any lien or liability for the payment thereof. "4. That the Lessors shall have a lien for the payment of said rent agreed to be paid by the Lessee herein in the manner hereinabove specified and for the performance of the agreements, conditions and covenants in this lease contained to be kept and performed by the Lessee upon all of the goods, chattels, furniture, fixtures, and equipment of the said Lessee which may be put upon the leased premises during the term of this lease and such lien may be enforced upon the nonpayment of any rent or the non-performance of any of the agreements, covenants and conditions by the taking and sale of such property in the same manner as in case of a chattel mortgage on default thereof. "5. That the Lessee has examined the leased premises and personal property; that no representations as to the condition of the repairs thereto have been made by the Lessors or by agents of the Lessors prior to or at the execution of this lease; that *401 Lessee has been informed that the leased premises and personal property are subject to a mortgage for $475,000.00 and is advised as to the terms and conditions of said mortgage, and this lease is expressly made subject to said mortgage, and in the event of the loss of title to or possession of said leased premises and personal property through a foreclosure of said mortgage or the appointment of a receiver there-under, Lessee hereby agrees that it shall not have any claim, suit, or cause of action of any kind or character against Lessors, or either of them, on account thereof. "6. That Lessee is advised that the leased premises and personal property were on March 31, 1943, and prior thereto, used and operated as a hotel operating property under the name of the Floridan Hotel and is advised that the Lessors as of April 1, 1943, became and were the purchasers of said leased premises, personal property and operating business and that the said Lessors took over said leased premises and personal property as of midnight, March 31, 1943; that the said Lessors took possession of said property subject to whatever sub-leases, occupancy by permanent tenants or other contracts, if any, with *402 persons, firms or corporations occupying portions of said hotel and that it is the intention of this lease that the Lessee herein take over the operation and conduct of said hotel as of midnight, March 31, 1943, so that this lease shall become effective as of the same moment that the Lessors became the owners of said leased premises and personal property; that the Lessee has examined the books and operating statements and operating conditions of said hotel as of March 31, 1943, and that no representations as to said operating conditions, tenants, agreements with tenants, prices, etc., have been made by the Lessors, except as specifically set forth in this lease. "7. That the Lessee shall procure and pay for all license or licenses required by any Governmental authority for the operation of said hotel business during the term of this lease and shall pay all taxes levied or assessed against all personal property owned by the Lessee, including supplies, if any, or used by the Lessee in the operation of said hotel during the term of this lease, and the said Lessors shall not be liable for the payment of said license taxes for the operation of said hotel or other taxes levied or assessed *403 against any property belonging to the Lessee. "8. That the Lessee shall not permit the leased premises, or any part thereof, to be used for any illegal purposes nor for any purpose that will constitute a nuisance, and that the Lessee shall at all times during the term of this lease obey and comply, at its expense, with all the legal requirements, rules and ordinances of the City of Tampa, Boards of Health or laws of the State of Florida or of the United States, and all legal requirements of public officials and Boards relating to the cleanliness, occupation and use of said leased premises, improvements thereon, and said personal property, additions thereto, or the business carried on therein, and shall obey and comply with all the rules and regulations of the United States now in force or hereinafter exacted relative to the prices to be charged or the kinds of service to be rendered. "9. That the Lessee has examined the inventory of the personal property and equipment as set forth on Schedule 'A' to this lease and by the execution of this lease accepts said inventory as being correct. "10. That as part of the consideration for the execution of this lease and as additional rental *404 to be paid by the Lessee to the Lessors, the Lessee agrees that it will keep in good condition and repair all of the linens, china, glass and silverware described in said Schedule 'A' and that it will replace any of such articles which may become broken, damaged or worn beyond repair, or lost or stolen, so that on the termination of this lease the Lessee shall deliver to the Lessors all of said articles, together with the replacement thereof, in as good condition as the same are now in and in like quantities. "That the Lessee shall also keep the said premises equipped with electric light bulbs and globes, and window shades so that at the expiration of this lease, when said premises and personal property are re-delivered to the Lessors, said premises and said personal property shall be of the same kind, character and quality as when received by the Lessee. "11. That the Lessee will at all times during the term of this lease keep and maintain all of the remainder of the personal property described on Schedule 'A', other than the linens, china, glass and silverware, referred to in Paragraph 10 above in the same condition as the same now is, fair wear and tear excepted, and that it *405 will at its own expense keep the same clean and make such repairs as may be necessary to keep and maintain said personal property in good condition. "12. That the Lessee will keep and maintain the interior of the leased premises in good condition and repair at its own expense so that at the expiration of this lease the interior of said leased premises shall be in the same condition of repair as the same now is, fair wear and tear excluded. "13. That the Lessee shall not remove or permit the removal of any of the goods, chattels, personal property, furniture, furnishings, fixtures, machinery and equipment, or any part thereof, from the leased premises, except with the written consent of the Lessors first had and obtained, but nothing herein contained shall prevent the Lessee from replacing an article of personal property with an article of the same kind and character and in which event the discarded or replaced article may be removed. "14. That the Lessee shall comply with all orders, rules and regulations of the Southeastern Underwriters Association and of the Municipal and State authorities relating to the safeguards against fire and permit the inspection of said leased premises *406 at all reasonable times by the Lessors or their representatives or by the authorized representatives of the Southeastern Underwriters Association. "15. That the Lessee will keep and maintain the leased premises in a reasonable safe condition for its operation as a hotel and the Lessors shall not be liable in any manner for any loss, damage or injury to the person or property of the Lessee, its agents or employees, its assignees and sub-lessees, guests in said hotel, invitees or licensees when upon said premises, including the areas adjacent thereto, and the Lessee does hereby agree to protect, indemnify and save harmless the Lessors of and from all liability by reason of any matter or thing occurring or happening upon the said leased premises during the term of this lease; the said Lessee agrees that it will carry, at its own expense, public liability insurance upon said premises and upon the elevators therein, in a company or companies, and in amount or amounts, to be approved by the Lessors which shall afford such protection as is usually afforded by such public liability insurance, and which insurance shall also provide for the protection of the Lessors. "16. The Lessee shall *407 not suffer or permit any lien to arise or be created against the Lessors' interest in the leased premises or the building thereon or against the personal property leased or the replacements made therein, and at the conclusion of this lease the said leased premises and personal property shall be turned over to the Lessors free, clear, released and discharged of and from any and all liens and encumbrances of any kind or character whatsoever placed or allowed to be placed thereon by the said Lessee. "17. That the Lessee shall not make any alterations in the building located upon the leased premises during the term of this lease without the consent in writing of the Lessors first had and obtained. "18. That the Lessors are not to be held accountable for any defects, either latent or patent, if any, which may now exist or which may hereafter develop in the building located on the leased premises or in the elevators, machinery, equipment, furniture, fixtures, or any other of the personal property which may be located on or in the above described leased premises and the Lessors are to be held harmless by the Lessee because of any injuries sustained by any person or persons because of *408 any such alleged defects in said building, elevators, machinery, equipment or personal property. "19. That the Lessee will not change the name of the hotel during the term of this lease, but will continue the operation thereof under the name of the Floridan Hotel. "20. That the Lessee shall not sublet the above described premises, or any part thereof, to any person, firm or corporation, either directly or indirectly, without the written consent of the Lessors first had and obtained, or make any assignment of this lease, either directly or indirectly to any person, firm or corporation without the written consent of the Lessors first had and obtained, but nothing herein contained shall prevent the Lessee from renting rooms in the said hotel to either transient or permanent guests. "21. That any and all replacements made to the personal property by the Lessee, and any and all additions and alterations made to the leased premises shall be and become the property of the Lessors at the expiration of this lease. "22. That the Lessee shall keep and maintain, at its own expense, the plateglass in said premises repaired and in the event the same should become broken, shall replace the *409 same immediately with the same quality of glass; the Lessee, however, may carry, at its own expense, plate-glass insurance in a company or companies, in an amount or amounts agreeable to the Lessors, but the carrying of such insurance shall not operate as a waiver of the responsibility of the Lessee to keep and maintain said plate-glass in proper condition and to replace the same in the event it should be broken or damaged. "23. The Lessors shall have the right at all reasonable times, either in person or by their duly authorized agents, to enter the leased premises, make inspection thereof and shall have the right to inspect any and all of the personal property leased hereby, make inventories thereof, and from time to time to check the same so that they may see that the Lessee is complying with the terms and conditions of this lease as to the keeping and maintaining of the personal property and the interior of the leased premises in good condition. "24. That any failure of the Lessors to declare this lease forfeited because of any violations of the covenants, terms and conditions herein on the part of the Lessee, shall not operate as a waiver of any of such violations or other *410 acts on the part of the Lessee, and that the Lessors may at any time after any violations of any of the covenants of this lease by the Lessee, declare said lease ended and terminated because of said violations regardless of the passage of time, except when the waiver thereof shall have been evidenced by a statement in writing, signed by the Lessors. It is further agreed that no custom of dealing by and between the Lessors and the Lessee shall be plead or urged as a defense by the Lessee, or as a waiver of the Lessors of any of the covenants and agreements herein contained. "25. That time is of the essence of this agreement, and of all, each and every of the terms, covenants, agreements, obligations and promises in and by this lease made to be kept, observed and performed, and should the rent herein specified, or any part thereof, be in arrears and unpaid for more than ten (10) days after the same shall become due and payable, or if the Lessee shall fail to perform any of the agreements, covenants and conditions on its part to be done and performed within a reasonable time after notice to perform shall have been served upon it by mailing a copy of such notice to it addressed c/o Floridan *411 Hotel, Tampa, Florida, or if a petition in bankruptcy be filed by the Lessee, or if a petition in bankruptcy be filed against the Lessee, and if the same shall not be dismissed within a reasonable time, or if a receiver be appointed in any legal proceeding instituted by or against the Lessee or in any proceeding in which the Lessee shall be a party, or if the Lessee shall make or offer any composition with creditors, or if any of the goods, chattels, rights or credits or effects of the Lessee, used in or incident to the operation of said leased premises, shall be seized, sequestered or impounded by virtue or under authority of any legal proceeding, which seizure, sequestration or impounding shall materially affect the possible continuation of the operation of said leased premises by the Lessee, then and in any of said events the Lessors shall have the right and option to declare this lease terminated, with the right in the Lessors to enforce the collection of all rents due or accrued at the termination thereof, and for such time as shall be required to evict the Lessee, and upon such termination the Lessors shall have the right immediately to reenter the leased premises, take possession *412 thereof and of the leased personal property without being required to take any legal action therefor, and the Lessee shall thereupon surrender said leased premises to the Lessors, and the Lessee does hereby agree to pay all costs, including a reasonable attorney's fee, which may be incurred or paid at any time or times by the Lessors on account of the breach or violation by the Lessee or any of the covenants herein contained on its part to be done and performed. "26. In the event the Lessee should operate the leased premises and personal property in a manner which the Lessors deem to be detrimental to the good will and operating business of the said hotel property, the Lessors shall have the right and privilege of informing the Lessee of such failure by written notice and in the event the Lessee does not within thirty (30) days after receipt of such written notice, correct said situation the Lessors shall have the right to terminate this lease and forthwith to re-enter and take possession of the leased premises and personal property, and to demand of and receive from the Lessee all rents accrued to the date of taking such possession. "27. The Lessee shall also pay to the Lessors *413 interest at the rate of six (6) per cent per annum upon all installments of rent, or for any other sum or sums due the Lessors after they respectively become due and payable. "28. In the event the Lessors should make a bona fide sale of the leased premises during the term of this lease they shall have the right and privilege of cancelling this lease upon sixty (60) days written notice to the Lessee, and upon receipt of said written notice the Lessee shall at the time specified therein deliver possession of the leased premises and personal property in the same manner as if this lease had terminated at the end of the period for which given. "29. The Lessee shall have no power to incur any indebtedness giving the right to a lien and no person shall ever be entitled to a lien, directly or indirectly, upon or against the leased premises and leased personal property, except with the written consent of the Lessors first had and obtained, and all persons contracting with the Lessee, doing of any work or furnishing of any materials upon or for the leased premises, and all persons whomsoever shall be bound by these provisions and by notice hereof from and after this date. "30. For the *414 convenience of the Lessee the Lessors reserve the right to name an agent or agents, or a succession of agents to receive the rents agreed to be paid by the Lessee and in the event the Lessee is notified by said Lessors, or any of them, to make such payments of rent to any such agent, the payment to such agent shall release and discharge the Lessee to the same extent as if payment had been made to the Lessors, or to those of the Lessors so designating such agent and requesting that such payment be made to said agent. Lessors at this time designate the Exchange National Bank of Tampa as their agent to receive said payments of rent, reserving the right, however, with notice to Lessee to change said agent or substitute another in the place and stead of said Exchange National Bank. "31. In the event the building located upon the above described premises, the same being known as the Floridan Hotel, should be totally destroyed by fire, tornado or other casualty, then this lease shall end and terminate. In the event of partial destruction or damage to the building so as to render part of the same unfit for use and occupancy by the Lessee and such partial destruction or damage can be reasonably *415 repaired within sixty (60) days, this lease shall not terminate except at the election of the Lessors, but the rental during the time of said repairs shall be subject to a proportional abatement. "32. That the Lessee, provided it has complied with all the terms and conditions of this lease and paid the rental as provided herein so as not to be in default in any of the terms and provisions of said lease, shall have the option of renewing this lease, from year to year, for a period of five (5) years from the date hereof, subject to and under the same terms and conditions herein contained, except that the rate of rental shall be redetermined from year to year so as to reflect a fair and reasonable rental for the then ensuing year, as herein provided. "Lessee upon electing to renew this lease shall notify Lessors, in writing, of its election at least sixty (60) days before the expiration hereof. Thereupon, Lessee and Lessors shall meet for the purpose of agreeing upon a fair and reasonable rental to be paid by Lessee for the renewed period. In the event Lessee and Lessors fail to agree upon the rent to be paid by Lessee within thirty (30) days after the date of said notice, then Lessee *416 and Lessors shall submit the question of said rental to arbitration in the following manner: Lessee shall select an arbitrator and notify Lessors thereof, in writing, giving the name of said arbitrator, at least twenty-five (25) days before the expiration of this lease, or of any renewed period, and Lessors shall likewise name an arbitrator and notify Lessee thereof, in writing, giving the name of said arbitrator, at least twenty-five (25) days before the expiration hereof, or of any renewed period. The said arbitrators shall select an umpire and the arbitrators and umpire thus selected shall promptly meet and hold a hearing, of which all of the parties shall be given reasonable notice, and they shall submit their respective contentions and be fully heard. Thereafter said arbitrators shall promptly determine the question. In the event said arbitrators shall disagree, the umpire shall participate in the discussion, and the award of any two shall be binding upon the parties. "No person shall be appointed by either Lessee or Lessors, as arbitrator, or by the arbitrators selected by them as umpire, unless he has been a resident of Hillsborough County, Florida, for a period of at least *417 five (5) years, and has for said period been a member of the Tampa Real Estate Board, in good standing; and any rental fixed by them shall be based upon a percentage of the gross profit on sales as defined herein and on a sliding scale based upon room occupancy as defined herein. "33. That this lease shall be binding upon the parties hereto, their respective heirs, personal representatives, successors and assigns. "34. That certain of the Lessors are out of the State of Florida due to the exigencies of war and that in order to facilitate the execution of this lease by all of the Lessors it is agreed that this lease may be signed upon any number of counter-parts with the same effect as if the signatures hereto and thereto were upon the same instrument, and that all of such instruments evidencing the signatures of the Lessors and Lessee shall be considered as the executed lease." 33. In negotiating the purchase of the Floridan and in formulating plans [for] its operation Smith, Cone and Manly recognized that the conditions prevailing in Tampa in 1934 might not continue after the war terminated. They felt that not only should the Floridan be paid for out of the earnings therefrom *418 but should be paid for as nearly as possible before the end of the war or as shortly thereafter as possible. The owners also were desirous of getting the maximum return possible therefrom under any operating arrangement that might be established. 34. For the year preceding the sale of the Floridan, Collier Florida paid Pickard a salary and bonus totaling approximately $5,600 for his services as manager. He agreed, and was employed by petitioner, to continue as manager of the Floridan for a salary of $500 a month or $6,000 a year plus a bonus of 20 per cent of petitioner's net operating profits. It was contemplated that the arrangement would result in total compensation to him of at least $10,000 a year. However, it was understood that in event the arrangement failed to work out satisfactorily to Pickard he could take up the matter with the petitioner's directors because it was felt that the success of the undertaking rested on him. Pickard recommended that the lease arrangement between the petitioner and the owners should be such as to permit the petitioner to realize an annual profit of about $20,000 to $25,000 before payment of his compensation as manager, or a net profit of about *419 $8,000 to $10,000 after payment of his compensation. 35. The lease was prepared by a committee composed of Wilkins, Collins and White assisted by R. H. McKenzie, and auditor for several hotel, including the Floridan. Since the owners of the Floridan were closely related through family ties or business associations with the stockholders of the petitioner it was recognized that the bona fides of the arrangement might be questioned for tax purposes. Accordingly in recognition of the desire of the owners to obtain the maximum possible return from the hotel which, with Pickard's services would require little additional in the way of supervisory or managerial services and in recognition of the fact that the petitioner had a capital of only $18,000 for employment in operating the property and in view of Pickard's suggestions or recommendations, the committee attempted to work out what they considered to be an arrangement that would be fair and reasonable to both the owners and to the petitioner who was to operate the property. In working out the details of the lease Wilkins and White represented both the owners and the petitioner. 36. Cone and Manly took no part in drafting the lease. *420 Smith sat in a conference at which the terms of the lease were considered and it was at his instance that the provisions for cancellation of the lease in event of sale of the property, and for the term of the lease to be for 12 months with an option to the petitioner to renew from year to year for a period of five years from the date of the lease were inserted. However, he had no part in formulating the percentage rental scale provisions of the lease. These were worked out by Wilkins, Collins and McKenzie and approved by Pickard. Manly did not read the lease before forwarding it to his daughter and her husband in California for signature because he left the preparation of it to accountants and counsel and did not consider that he would have benefited by reading it. After his sons had examined the lease and asked his opinion about it from their standpoint, Cone read it and advised them that it was all right and also that it was satisfactory to him as a stockholder in the petitioner. Since his personal income and the income of the corporations in which he was interested were in such high tax brackets in 1943, he was not particularly concerned as to the amount of profits the petitioner *421 might earn as he felt he would realize little benefit therefrom. However, he was interested in seeing that a fair deal was worked out between the petitioner and the owners. After White, who represented the owners, as well as the petitioner, had drafted the lease and Pickard had expressed his satisfaction with, and approval of it, Smith read it carefully and signed it as president of the petitioner. 37. When the purchase of the Floridan was completed on May 10, 1943, the petitioner took over from Collier Florida certain miscellaneous working assets which were being used in the operation of the hotel. In addition the petitioner paid some of the closing costs (documentary stamps) incurred in the transfer of the real estate. The assets acquired by the petitioner, the amounts which it paid therefor, the closing costs paid and the date of payment were as follows: Amount
Date paid
paid
Petty Cash funds
May 12, 1943
$ 3,500.00
Food, beverages and
supplies
May 12, 1943
8,619.47
Unexpired insurance
and licenses
May 12, 1943
1,649.32
Closing costs
1,187.50
$14,956.29
38. On or about May 10, 1943, but effective as of April 1, 1943, the petitioner *422 began operating the Floridan under the lease executed by it and the owners. Pickard continued to serve as manager and exercised his own discretion in all matters involving its management. In matters relating to modification of the terms of the lease or to improvements or alternations and similar matters Pickard acted under the supervision of the officers or directors of petitioner but mostly under the supervision of Smith and Cone. 39. The following is a statement of the petitioner's income and expenses as shown by its books for the fiscal years ended March 31, 1944 through March 31, 1949, together with uncontested adjustments in income made by the respondent: Gross Sales:
March 31, 1944
March 31, 1945
March 31, 1946
Room Rentals
$399,629.48
$412,802.22
$435,173.10
Food & Beverages
409,781.26
496,107.54
454,813.73
Other Income
63,173.88
68,748.71
75,159.29
TOTAL SALES
$872,584.62
$977,658.47
$965,146.12
Expenses: Wages & Expenses applicable to
Rooms
$ 91,185.21
$109,827.80
$131,017.24
Cost of Food & Beverages Sold
171,710.10
204,420.36
204,387.12
Wages & Direct Exp. Food & Bev-
erages
110,740.21
149,619.95
156,255.95
Costs & Direct Exp. Other Income
56,402.34
60,352.23
65,780.15
$430,037.86
$524,220.34
$557,440.46
GROSS PROFIT ON SALES
$442,546.76
$453,438.13
$407,705.66
OTHER EXPENSES: Rent Under lease
$312,681.34
$312,237.15
$245,773.74
Repairs & Maintenance
26,181.64
30,523.43
37,587.23
Heat, Light, Power, etc.
24,803.32
27,163.02
28,585.17
Amortization of Bldg. Improvements
11,689.03
11,689.03
12,467.29
General & Administrative Exp.
56,040.58
63,325.15
71,682.17
Attorney's Fees,
Defending Proposed
Deficiency in income tax
$431,395.91
$444,937.78
$396,095.60
Net Income reported in income tax
returns
$ 11,150.85
$ 8,500.35
$ 11,610.06
Uncontested adjustments in income
made by respondent: Decrease in Amortization Improve-
ments
$ 9,935.68
$ 8,182.32
$ 8,182.32
Other Adjustments
625.00
375.00
Total adjustments
$ 10,560.68
$ 8,182.32
$ 8,557.32
Net Income After Uncontested Adjust-
$ 20,167.38
ments
$ 21,711.53
$ 16,682.67
*423 Gross Sales:
March 31, 1947
March 31, 1948
March 31, 1949
Room Rentals
$427,863.99
$455,985.17
$444,144.61
Food & Beverages
389,555.72
438,787.79
371,436.89
Other Income
81,114.10
82,680.73
88,041.67
TOTAL SALES
$998,533.81
$972,453.69
$903,623.17
Expenses:
Wages & Expenses applicable to
Rooms
$128,833.54
$142,995.53
$135,164.14
Cost of Food & Beverages Sold
265,345.29
226,494.23
192,523.16
Wages & Dirext Exp. Food & Bev-
erages
180,508.38
180,371.51
151,840.16
Costs & Dirext Exp. Other Income
76,173.57
77,573.80
83,794.20
$650,860.78
$627,435.07
$563,321.66
GROSS PROFIT ON SALES
$347,673.03
$345,018.62
$340,301.51
OTHER EXPENSES:
Rent Under lease
$190,128.16
$165,340.40
$150,909.42
Repairs & Maintenance
23,438.24
31,318.64
32,828.95
Heat, Light, Power, etc.
32,419.56
35,957.06
38,795.70
Amortization of Bldg. Improvements
1,016.34
4,621.51
4,853.74
General & Administrative Exp.
80,772.49
88,856.69
90,290.67
Attorney's Fees,
Defending Proposed
Deficiency in income tax
11,411.90
11,008.41
$327,774.79
$337,506.29
$328,686.89
Net Income reported in income tax
returns
$ 19,898.24
$ 7,512.33
$ 11,614.62
Uncontested adjustments in income
made by respondent: Decrease in Amortization Improve-
ments
$ (3,506.71)
other Adjustments
Total adjustments
$ (3,506.71)
Net Income After Uncontested Adjust-
ments
$ 16,391.53
$ 7,512.33
$ 11,614.62
*424 40. The rents payable under the lease of May 8, 1943, have been collected and disbursed by the Exchange National Bank of Tampa as trustee for the 12 owners. This arrangement, sometimes hereafter referred to as the Floridan Hotel Owners Trust, was established by each of the owners, on or about May 10, 1943, delivering to the Exchange National Bank a letter which reads in part as follows and the bank's agreement to act in accordance therewith: "Gentlemen: "As of April 1, 1943, I became the owner of a one-twelfth undivided interest in and to the Floridan Hotel property in the City of Tampa, Hillsborough County, Florida, and, as of the same date, I executed a lease on said property to Floridan Hotel Operators, Inc., a Florida corporation, and, under and by virtue of the terms of said lease, I shall be entitled to receive monthly certain rentals for my undivided interest in and to said property. I have instructed the Floridan Hotel Operators, Inc. to pay my portion of said rental to you, and that you will receipt it on my behalf for the amount so paid. You, of course, are not burdened with the responsibility of seeing that the amount paid is the correct amount; nor are you to assume *425 any responsibility of collection, except to receive said money and notify me as and when the same is paid, and disburse it as hereinafter authorized. "My interest in and to the said Floridan Hotel property is subject to a mortgage dated April 7, 1943, to the Collier Florida Coast Hotels, Inc., and although I am not personally liable on the mortgage or the note secured thereby, for the time being and until further instructions to you by me, I desire that the money received by you as rentals be accumulated and, so far as it will go, used for the following purposes: "1. To pay 1/12th of the interest upon said note so secured by said mortgage in accordance with the tenor of said note; the interest begins to run on the note on April 1, 1943. "2. To pay 1/12th of each of the principal payments, as called for in said note, as the same matures. In the event there is sufficient money on hand, you may pay, at any time and at your election, unless otherwise directed by me, 1/12th of any part or all of the next maturing installment or installments on said note, as it is provided therein that payments may be made on the installments of said note at any time or times. "3. To pay 1/12th of *426 the insurance premiums which may become due in order to maintain the insurance as required under the terms of said mortgage. "4. To pay, during the month the same becomes payable, unless otherwise directed by me, 1/12th of the taxes levied against the said Floridan Hotel property, both real and personal. "This letter will, therefore, authorize you to accept from the said Floridan Hotel Operators, Inc. the said rentals and deposit the same in your bank in an account to be opened in my name, and you are authorized from time to time to withdraw from said account and pay the items set forth above. "You are to keep records of all receipts and payments hereunder, and I, or my agents, shall be permitted to examine such records at reasonable times. "You are not expected to make or file reports to any bureau or agency of the State of Florida or Federal Government, except such as the law requires you to make and file. "I reserve the right to revoke this letter by notifying you in writing of my election so to do, but for any payment made by you in accordance herewith, prior to receipt by you of such written notice of revocation hereof, you are hereby relieved of any and all liability *427 to me or to my heirs, personal representatives and assigns. Upon receipt by you of such written notice of revocation, you will discontinue receiving said rents and pay over to me any sum due me, and you may notify any one or more of the owners of said property who may have authorized you to receive such rentals for them. "In the event each of the twelve owners of said hotel property, to wit, Marjorie Smith Green, Paul H. Smith, Jr., Ernest M. Smith, Julian L. Cone, Jr., C. W. Cone, Zula B. Poe, Mary Dressler, Maude W. Taylor, Julia M. Flom, J. A. Gray, E. M. Gray and Lillian W. Merrell, deliver to you a letter of like effect to this, then you are to place and keep all rentals in one account under the name of "Floridan Hotel Owners" and dispurse the same for the purposes hereinabove specified; and should funds at any time accumulate in said account in excess of any amounts due and to become due within a period of three months, as principal and interest upon said mortgage, and insurance and taxes, then any one or more of said owners may request a distribution of such excess amount, in which event you are to make such distribution of such excess amount pro rata among said owners, crediting *428 to my personal checking account one-twelfth of the amount so distributed." 41. The books of account of the Floridan Hotel Owners Trust have been kept, and its tax returns which were prepared on the basis of a taxable year ended December 31, have been filed, on the cash basis. The Trust filed fiduciary income tax returns for the years 1943 through 1946 and a partnership return of income for 1947. The returns disclosed the following with respect to the income, deductions and distributive shares of the trust income: 1943
1944
1945
1946
1947
Rents - Hotel
$211,581.69
$279,946.02
$275,340.85
$172,500.00
$202,656.53
Rents - Garage
8,700.00
15,000.00
Other income
Gross income
$211,581.69
$280,203.20
$275,340.85
$181,200.00
$217,656.53
Less: Depreciation
$ 23,975.28
$ 31,966.96
$ 32,225.47
$ 34,685.37
$ 33,523.22
Repairs
84.60
48.00
5,433.16
Insurance
3,433.04
3.20
6,041.66
323.30
1,902.81
Taxes
17,479.78
28,142.76
31,411.39
54,608.48
55,407.28
Interest
8,900.00
12,426.66
6,503.89
3,784.21
2,926.25
Legal or accounting fees
1,204.15
300.00
716.00
3,190.30
Trustee's fee
2,000.00
1,500.00
1,500.00
1,500.00
Miscellaneous deductions
7.25
1.35
Total deductions
$ 54,992.25
$ 74,924.18
$ 77,682.41
$ 95,672.61
$103,884.37
Net income available for distribution
$156,589.44
$205,279.02
$197,658.44
$ 85,527.39
$113,772.16
Distributive shares: Marjorie S. Green
$ 13,049.12
$ 17,106.59
$ 16,471.54
$ 7,127.28
$ 9,481.02
Paul H. Smith, Jr.
13,049.12
17,106.58
16,471.54
7,127.29
9,481.01
Ernest M. Smith
13,049.12
17,106.58
16,471.54
7,127.28
9,481.01
Julian L. Cone, Jr.
13,049.12
17,106.58
16,471.54
7,127.29
9,481.01
C. W. Cone
13,049.12
17,106.58
16,471.53
7,127.28
9,481.02
Zula B. Poe
13,049.12
17,106.59
16,471.54
7,127.28
9,481.02
Mary Dressler
13,049.12
17,106.59
16,471.53
7,127.28
9,481.01
Maud W. Taylor
13,049.12
17,106.59
16,471.54
7,127.28
9,481.01
Julia M. Flom
13,049.12
17,106.59
16,471.54
7,127.28
9,481.01
J. A. Gray
13,049.12
17,106.58
16,471.54
7,127.29
9,481.02
E. M. Gray
13,049.12
17,106.59
16,471.53
7,127.28
9,481.01
Lillian W. Merrell
13,049.12
17,106.58
16,471.53
7,127.28
9,481.01
Total
$156,589.44
$205,279.02
$197,658.44
$ 85,527.39
$113,772.16
*429 42. On occasions Smith and Cone authorized the Exchange National Bank to disburse funds which it held in the Floridan Hotel Owners Trust. These disbursements were for insurance premiums, accounting fees, repair bills, taxes and equipment, including certain air conditioning equipment installed in the hotel at a cost of $15,000. Some disbursements were approved by Smith after his children had returned to the Tampa area from military service. 43. The following is a statement of the payments made through the Floridan Hotel Owners Trust of the $475,000 purchase money note and mortgage: Date
Amount paid
Balance
May 10, 1943
$475,000
June 28, 1943
$ 60,000
415,000
October 4, 1943
30,000
385,000
January 5, 1944
30,000
355,000
April 3, 1944
60,000
295,000
July 3, 1944
60,000
235,000
October 4, 1944
5,000
230,000
January 8, 1945
5,000
225,000
March 23, 1945
85,000
140,000
July 2, 1945
40,000
100,000
October 3, 1945
25,000
75,000
January 7, 1946
25,000
50,000
April 15, 1946
5,000
45,000
April 4, 1947
45,000
44. The petitioner maintained on its books an account designated "Rent account" with respect to the rentals due the owners *430 under the lease of May 8, 1943. This was a personal account with the owners. For the years ended March 31, 1944, through March 31, 1947, the petitioner kept no other rent account and no operating account in which the petitioner's rental expense was accrued from month to month. The rentals due the owners were not computed and credited to the "Rent account" each month but in closing the books at the end of the fiscal year the amount of rent due for the entire year was computed and credited to the account. However, periodically during the year the petitioner transferred odd sums to the Exchange National Bank for the account of the Floridan Hotel Owners Trust and such sums were debited to the "Rent account" on petitioner's books. The rentals due by petitioner have not always been paid by the 10th of the month following that for which they were due as provided in paragraph 2 (e) of the lease. Where the rentals were not so paid the petitioner has not paid interest thereon as provided in paragraph 27 of the lease. 45. From time to time Pickard arranged for meetings of the 12 owners of the Floridan which, in addition to Pickard, were usually attended by White, Wilkins and as many of the *431 owners as were available. Smith, Cone and Manly were also present on some occasions. No minutes were kept of these meetings. The first meeting was held in the spring of 1944 and was attended by approximately seven of the owners. At this meeting Wilkins explained the lease and a discussion of it occurred. Prior to that Wilkins had not had any contact with the owners. Another meeting was held in December, 1944, possibly another in 1945, and another in May, 1946. 46. Wilkins and White represented both the petitioner and the owners at the early meetings of the owners. The owners took little active part in the early meetings and accepted without question what Pickard and Wilkins reported. At the later meetings the owners took a more active part. At the May, 1946, meeting several of the owners were represented by counsel other than Wilkins and White. The Cone brothers, Mary Dressler, Julia M. Flom and Maud W. Taylor were represented by a local attorney, John M. Allison. The ladies represented by Allison were keenly interested in a proposal by Pickard for the installation of new rugs and for furnishings in part of the hotel. The Cone brothers were keenly interested in a proposal to acquire *432 a garage to be operated in connection with the hotel. 47. For the fiscal year ended March 31, 1944, the petitioner paid the owners through the Floridan Hotel Owners Trust rentals determined by application of the formula and sliding percentage scale set out in paragraph 2 of the lease. By agreements of the owners from time to time the rentals paid in subsequent years were determined at lower percentages than those set out in the lease. The effective percentage scales were as follows for the years indicated: Years ended
March 31,
Year ended
Year ended
1946
Year ended
Room
March 31,
March 31,
March 31,
March 31,
Occupancy
1944
1945
1947
1948
1 - 5000
38%
33%
24%
19%
5001 - 5500
40 35 26 21 5501 - 6000
42 37 28 23 6001 - 6500
44 39 30 25 6501 - 7000
46 41 32 27 7001 - 7500
48 43 34 29 7501 - 8000
50 45 36 31 8001 - 8500
51 46 37 32 8501 - 9000
52 47 38 33 9001 - 9500
53 48 39 34 9501 and over
54 49 40 35 48. The rent reductions were not requested or arranged prior to the beginning of the fiscal year *433 to which they were applicable as provided in paragraph 32 of the lease because Pickard found that it was impossible to determine so far in advance what percentages could be applied so as to permit the petitioner to realize a profit. Instead, the reductions were decided upon some time during the year to which applicable and were made retroactive to the beginning of the year. The petitioner requested the reductions at the suggestion of Pickard after an analysis of operations for the first six or eight months of the year under the prevailing percentages disclosed that petitioner was operating at a loss and that a reduction was necessary to enable it to earn a profit. No request for a reduction was made unless the petitioner needed it to show a profit. Being of the opinion that the owners of the hotel were interested in its being operated successfully and not at a loss, Pickard felt that they would authorize a reduction of the rent at any time such action was necessary to prevent petitioner from sustaining a loss. Upon each occasion that Pickard proposed a reduction in rent the proposal, appearing to the owners as justifiable, was approved by them and put into effect. 49. Shortly after *434 the petitioner began operating the Floridan Pickard suggested to the stockholders that profits might be increased by enlarging and redecorating the bar and moving the coffee shop to the dining room space on the main floor. At a meeting held on August 3, 1943, the petitioner's board of directors approved Pickard's proposal and authorized the expenditure of $35,000 to make the improvements. A motion was also adopted directing petitioner's officers to obtain, if possible, an extension of the lease so as to make it for a term of three years and that the expenditures incurred in making the improvements be amortized over the three-year period. The improvements were thereafter made during the period from September, 1943, to January 1, 1944, at a cost of $35,067.09, which was capitalized on the petitioner's books and amortized, on the petitioner's books and in its income tax returns, on the basis of a three-year life for the improvements. Adjustments changing the period of amortization to ten years have been made in the notices of deficiency and are not contested by petitioner. 50. On January 10, 1944, the petitioner wrote the owners as follows about the improvements, the petitioner's interpretation *435 of certain provisions of the lease and an extension of the lease for two years: "Dear Sirs and Madams: "It is provided in the lease of the Floridan Hotel from you to the undersigned, which lease became effective as of the 1st day of April, 1953, 'that the Lessee shall not make any alterations in the building located upon the leased premises during the term of this lease without the consent of the Lessors first had and obtained.' "Most of you know of certain contemplated alternations, some of which have been made, and some of which have not been made. The undersigned Lessee is in doubt as to whether the said alterations are of such nature as to be forbidden by the above quoted provision in the lease. "We, therefore, advise that the alternations which have been made and are to be made are as follows: "(a) The removal of the coffee room to the second or main floor. "(b) The conversion of the coffee room into a cocktail lounge which will necessitate the leveling of the floor. "(c) The removal of the kitchen in order to connect the cocktail lounge with the bar. "In order that there can be no question raised we shall appreciate your assenting to such alternations. "The *436 undersigned Lessee would not have made alterations as have been made or make those contemplated, as the expense of these alternations will run into a considerable figure, unless the lease can be extended as provided therein "It is provided by Section 32 of the lease that this Lessee has the option to renew this lease from year to year subject to and under the same terms and conditions as outlined in the lease, except as to the rate of rental. "The undersigned Lessee, therefore, notifies the Lessors in writing of its election to renew this lease certainly for an additional year and with the permission of the Lessors for a two year renewal period. "The rental as prescribed by said lease is agreeable to the undersigned Lessee for the additional period, but the Lessee feels that for the sake of clarity the lease should be considered as amended from the beginning in the following particulars to comply with the interpretations thereof which have been followed: "Sub-section (3) of Sub-section (b) of Paragraph 2 should be amended to read as follows: "'The amount received from laundry and barber shop revenues, less the cost of laundry service and incidental expenses and payroll of *437 the barber shop.' "In explanation of this change we might say that the only change is the addition of the words 'and payroll'. It was the understanding in the beginning that these words should be included and the deductions of the payroll have accordingly been made. "Sub-section (4) of Sub-section (b) of Paragraph 2 should be amended to read: "'The excess of telephone charges over the cost of service rendered, including wages incurred by Lessee in rendering this service.' "The only change made is the addition of the phrase 'including wages incurred by Lessee in rendering this service'. "From the standpoint of the Lessee as above suggested it is not necessary to make these changes in the lease as our interpretation of the lease has included these provisions just as if they had been contained in the lease. "Two copies of this letter is being forwarded to each of the Lessors. It would be appreciated if one of the copies would be returned with the memorandum on the bottom wherein permission is given to make the alternations as outlined above. "In view of the amount involved in making the alternations we also ask that you consent at this time to the extension of the lease *438 for an additional period of two years from March 31, 1944; such extension is also set forth in the attached memorandum. Each of the Lessors is requested to sign and return a copy thereof so that our files may be complete." 51. To the petitioner's letter of January 10, 1944, each of the owners replied as follows: "I hereby acknowledge receipt of the above and foregoing letter and consent to the alternations made and proposed to be made by you as outlined in your letter. "I further agree that the lease as interpreted by your letter with the changes therein made, be renewed by you for a period of two years from and including the 1st day of April, 1944, and including the 31st day of March, 1946, but with the understanding that all other terms and conditions in said lease, including the rate of rental, as set forth therein, remain unchanged and in full force and effect. "It is understood that this consent and agreement only relates to my interest in and to the property covered by said lease." 52. As Pickard had anticipated the profits from the hotel bar increased greatly after completion of the improvements. During 1944 other hotel improvements consisting of the installation of *439 certain air conditioning equipment and carpeting, were made at a cost of $12,049.93 which was paid by petitioner. At a meeting of the petitioner's board of directors on October 30, 1944, it was decided that before any further substantial sums were expended for improvements the directors should meet, and if necessary, discuss the same with the owners of the hotel. Further, Pickard was authorized to contact the owners and arrange, if possible, for them to pay the cost of some of the improvements made and to be made. Thereafter in letters dated December 23, 1944, the owners, in addition to approving the rent reduction for the year ended March 31, 1945, heretofore mentioned, agreed that the cost of the 1944 improvements, $12,049.93, might be treated as a payment of rent. By an entry said amount was charged to the "Rent account" on petitioner's books. 53. At their meeting in May, 1946, the owners employed G. Bland Leach, C.P.A., of Leesburg, Florida, to make an audit for the fiscal years ended March 31, 1944, through March 31, 1946, of the petitioner's records covering transactions relevant to the lease of May 8, 1943. Leach made a limited audit of the petitioner's records and a verification *440 of payments under the lease to the Floridan Hotel Owners Trust. In a report dated June 20, 1946, he reported that there had been a technical overpayment of rent by the petitioner resulting from the inclusion of uncollected room rents charged off as bad debts in the "gross profit on sales" figure to which the sliding percentage scale of rates was applied. He did not compute the amount of the overpayment because he considered the cost of making the necessary analysis would exceed the amount involved. Leach further reported that during the three-year period the petitioner had underpaid rent in the total amount of $3,440.78. With respect to the item Leach commented in his report as follows: "Under strict interpretation of the terms of the lease additional rents are due from the 'Operators' in the amount of $3,440.78 by applying the rates shown in Schedule 2 to the 'Gross Profits from Sales' as shown by the Operators records. No equalizing provision was contained in the lease to prevent a severe increase in amount of rent payable where room occupancy slightly exceeded any particular bracket. The 'Operators' records were based on a setback to a lower bracket where the room occupancy did *441 not enter the next higher bracket to a material extent. I have found no authorization of this setback or equalization." 54. Leach has made two additional audits for the owners. One of these covered the year ended March 31, 1947, and the other covered the years ended March 31, 1948, and March 31, 1949. Neither of these reports indicates that the petitioner has paid the $3,440.78 of additional rent which the report of June 20, 1946, indicated was due. 55. The lease of May 8, 1943, was renewed by petitioner from year to year (except the renewal for the two years ended March 31, 1945, and March 31, 1946) through the five-year period covered by it. Except for the notice given in its letter of January 10, 1944, relating to the years ended March 31, 1945, and March 31, 1946, the petitioner has not notified the owners in writing of its election to renew as provided in paragraph 32 of the lease. In managing the hotel Pickard did not refer to the lease or make any efforts to follow its terms or provisions except those relating to the computation of rent. He did not consider it was necessary for him to do so because the arrangement was adjustable and the owners were always in agreement with *442 whatever the petitioner asked them to do. 56. The minute book of the petitioner shows that beginning in April 1943 and continuing into May 1947 meetings of the stockholders of the petitioner were held each year and that over the same period eight meetings of the directors were held. The minutes of these meetings do not refer to any renewals or modification of the lease or rent reductions except the minutes of the directors meeting of August 3, 1943, at which the officers of the petitioner were directed to obtain an extension of the lease to make it for a term of three years, and the minutes of the stockholders meeting of April 16, 1946, where it was reported that the owners of the Floridan had agreed to a rent deduction to which the petitioner's board of directors had agreed. 57. The petitioner paid no salary to any of its directors nor to any of its officers except Pickard. The salary and bonus paid Pickard were as follows for the years indicated: Year Ended
Salary
Bonus
Total
March 31, 1944
$6,000
$5,709.97
$11,709.97
March 31, 1945
6,000
5,047.34
11,047.34
March 31, 1946
6,000
6,077.37
12,033.77
March 31, 1947
6,000
7,495.31
13,495.31
*443 The bonus paid for the years ended March 31, 1944, through March 31, 1946, was computed at 20 per cent of the petitioner's net operating profits. Since such percentage would have resulted in lesser compensation than for the preceding year the petitioner adjusted the percentage upward for the year ended March 31, 1947. 58. During the period beginning April 1, 1943, and ending March 31, 1949, the petitioner declared and paid dividends as follows: Date of
To stock-
Total
directors'
holders of
Dividend
dividend
meeting
record on
per share
paid
May 3, 1945
May 1, 1945
$16.00
$2,880
April 16, 1946
April 16, 1946
8.00
1,440
May 8, 1947
May 8, 1947
8.00
1,440
December 10, 1948
December 31, 1948
50.00
9,000
59. By an instrument dated June 18, 1948, and executed about July 15, 1948, the petitioner and the owners of the Floridan agreed to extend the lease of May 8, 1943, for one year from and including April 1, 1948, and the petitioner was granted the option of renewing the lease from year to year for an additional period of four years. Under the instrument of June 18, 1948, all terms and conditions of the May 8, 1943, lease were continued *444 in full force and effect except that the formula for computing rent was changed to the following: "(a) An amount equivalent to five percent (5%) of 'monthly gross profits from dining room', plus (b) An amount equivalent to five percent (5%) of the 'monthly gross profits from barber shop', plus (c) An amount determined by applying to the 'monthly gross profits from other operations' the applicable percentage taken from the following schedule. If the Room
The applicable
Occupance during
percentage
the month is
shall be
1 to 5000
19
5001 to 5500
21
5501 to 6000
23
6001 to 6500
25
6501 to 7000
27
7001 to 7500
29
7501 to 8000
31
8001 to 8500
32
8501 to 9000
33
9001 to 9500
34
9501 and over
35
"As used herein: "The term 'monthly gross profits from dining room' shall be taken to mean the total receipts from the operation of the dining room during the month less the cost of food and beverages served in the dining room during that month. "The term 'monthly gross profits from barber shop' shall be taken to mean the total receipts of the barber shop during the month less the payroll and the incidental expenses of the barber shop during such *445 month. "The term 'monthly gross profits from other operations' shall be taken to mean "i. The total receipts from room rentals during the month, and "ii. The total receipts from sales of food and beverages or other merchandise during the month (exclusive of food, beverages, and other merchandise sold in connection with the operation of the dining room and the barber shop) less the cost of such food, beverages and merchandise sold during the month, and "iii. The excess of telephone charges over the cost of services rendered, including wages incurred by Lessee in rendering this service, during the month. "The term 'Room Occupancy during the month' shall be taken to mean the number of rooms per day occupied during the month by transient guests on a pying basis, and where rooms are occupied by permanent guests paying rent on a monthly basis, such room or rooms shall be credited with one-fourth (1/4) of a day's occupancy for each actual day so occupied during the month. For example - Days in
Room
Rooms
Month
Occupancy
Transient 231 at
31
7,161
Permanent 115 at
31 - 3,545
at 1/4
861
Total room occupancy for the month
8,022"
60. At or about *446 the time the agreement of June 18, 1948, was executed the owners of the Floridan negotiated a loan of $550,000 from Penn Mutual Life Insurance Company and executed a first mortgage on the hotel as security. As conditions to making the loan and as additional security, Penn Mutual required the owners and the petitioner to execute an agreement making the lease subordinate to the mortgage, and assigning the lease to Penn Mutual. The agreement provided in part as follows: "1. The OWNERS and the LESSEE [petitioner] do hereby severally and respectively covenant, consent and agree to and with the MORTGAGEE [Penn Mutual] that the LEASE shall be and the same hereby is made subject and subordinate in each and every respect to the lien of the first mortgage held by the MORTGAGEE. "2. The OWNERS hereby assign, transfer and set over unto the MORTGAGEE the said LEASE as additional security, and for the consideration aforesaid, the OWNERS hereby covenant and agree to and with the MORTGAGEE that they will not, without the written consent of the MORTGAGEE "(a) Cancel said LEASE or accept a surrender thereof unless the OWNERS and the LESSEE shall execute a new lease which shall go into effect *447 prior to or simultaneously with said cancellation and surrender, said new lease to provide for a rental not less than the rent payable under the cancelled LEASE and which shall not diminish the LESSEE'S obligation to pay taxes and insurance to the extent that such obligations may exist under the cancelled LEASE, and which new lease shall run to a date which shall not be prior to the expiration of the said cancelled LEASE. OWNERS covenant and agree to assign said new lease to MORTGAGEE in the same form and manner as they assigned the said cancelled LEASE. "(b) Reduce the rent. "(c) Modify said LEASE, either orally or in writing, so as to decrease the term of the lease, reduce the rent or diminish the obligations of the LESSEE with regard to the payment of taxes and insurance. "(d) Consent to an assignment of the LESSEE'S interest in said LEASE which will relieve the LESSEE of liability for the payment of rent and the performance of the terms and conditions of the LEASE, and any of the above acts, if done without the written consent of the MORTGAGEE, shall be null and void." 61. Of the $550,000 loan received from Penn Mutual $70,000 was used to make certain repairs and improvements *448 to the Floridan and the remainder, or $480,000, was distributed equally among the 12 owners. 62. Under date of May 20, 1950, but effective as of April 1, 1949, the petitioner and the owners entered into an agreement which recited that it was executed so as to reduce to writing an oral understanding reached by the parties in December, 1949. By the agreement of May 20, 1950, the lease of June 18, 1948, was modified by adding 3 to each of the percentages used in the rental formula set out in the lease. 63. During the period from April, 1943, through 1949 the owners received cash distributions from the Floridan Hotel Owners Trust in the total amount of $862,000 of which $480,000 represented a portion of the Penn Mutual loan obtained in 1948. The total received by each owner has been either $71,833.33 or $71,833.34. The owners have used these cash distributions in part to pay their personal income taxes, to repay funds borrowed when the hotel was purchased, to make various investments and for personal purposes. Neither Smith, Cone nor Manly has received or handled any of the cash so distributed except as follows: (a) Under powers of attorney from his three children Smith handled their *449 affairs while they were away from Tampa during the war. The distributions received by Paul Smith, Jr. were deposited in a bank account which his father handled. From time to time, the three Smith children have made loans to Paul H. Smith Construction Company. These loans bore interest and have been repaid. Some of the money received by the Smith boys has been invested in Edwards Sash Door and Lumber Company, a corporation organized after their return from the military service. Their father, Paul H. Smith, provided financial assistance in organizing this corporation which sells a portion of its products to Paul H. Smith Construction Company. Marjorie S. Green has invested most of the money which she received in a large apartment project in Jacksonville, Florida, which was constructed by Paul H. Smith Construction Company. (b) The Cone boys used about $60,000 of the money they received to purchase some drainage bonds which were a lien against their farm, part of which was a gift in trust to them by their father. They also used some of the money to purchase an interest in another Tampa hotel. (c) Zula B. Poe used $15,000 of the money she received to purchase a mortgage held by Florida *450 Land Holding Company on some orange groves owned by Cone and his wife. Cone and his wife have since paid the indebtedness. (d) After the purchase of the Floridan, J. Ashton Gray and his wife maintained a special bank account at Leesburg, Florida, in which their cash distributions were deposited while they were away from Leesburg. Mrs. Gray's father, J. D. Manly, was authorized to draw checks on this account for the payment of their income tax and interest on their loan at the bank. Manly made some loans from the account to third parties and may have borrowed money from the account for himself. About 1948 Mrs. Gray loaned $33,000 to the J. D. Manly Construction Company. All of these loans have been repaid. 64. While from time to time some of the owners have sought advice from their fathers as to matters relating to the Floridan and other owners have sought similar advice from their husbands they (the owners), since the purchase of the hotel, have regarded themselves the exclusive owners of one-twelfth interests therein and of the income arising therefrom. 65. The provisions of hotel leases vary, dependent on the properties involved as well as other factors. However, the usual *451 hotel lease is for a definite term of years, rather than from year to year, provides for a definite minimum amount of rental even though the rental is on a percentage basis and requires the lessee to provide some type of security to insure payment of the agreed rental and the performance of the lessee's other obligations under the lease. Ordinarily the lessee is required to carry whatever liability insurance is necessary to provide protection against liability for injuries sustained by guests. 66. The provisions of hotel management contracts vary dependent upon the situations involved. Where owners have their hotels operated under such contracts the fee received by the operator for management services ranges from 1 1/2 per cent to 4 per cent, but on an average from 2 per cent to 2 1/2 per cent, of gross receipts. The operator's fee is usually taken out of the gross receipts and its payment is assured regardless of whether the operation results in a net profit or a net loss. The ordinary hotel management contract places no risk on the operator. Nor does it require the operator to invest any capital or obligate him to bear the cost of ordinary repairs or the cost of replacing expendable *452 equipment. Hotel management contracts customarily provide for their cancellation at the option of the hotel owner upon 60 days notice in event the property is sold. 67. The lease of May 18, 1943, is unusual and unlike either leases or management contracts ordinarily used in the hotel business. It differs from the usual lease in that there is no provision for a fixed minimum rental. The sliding scale of percentages involved in the rental formula is not customarily found in either leases or management contracts. The partial destruction clause in the lease giving the owners the right to cancel it in event of partial destruction of the hotel also is unusual. 68. In the successful operation of a hotel good management is equally as important as the hotel property if not more so. Men competent to manage hotels are in demand and are difficult to locate. 69. Normally a hotel operator cannot pay more than 20 per cent of gross receipts as rent and realize a profit from the operation. At one time when the percentage of room occupancy was not as high as in recent years it was considered sound to set rents at an amount which the operator could pay on the basis that operations at 60 per cent *453 of room occupancy was the break-even point. However, at the present time the break-even point contemplates an occupancy of about 80 per cent. In some instances hotel rents are based upon a percentage of gross receipts from room rentals. In such cases the percentages vary from a low of 15 per cent to a high of 50 per cent dependent upon the circumstances. 70. During World War II the United States Government leased about 50 hotels containing approximately 3700 rooms in St. Petersburg, Florida, for use by soldiers. Under these leases the furnishings except beds, mattresses, dressers and a minor part of the lobby furniture of a hotel were removed and stored in three or four rooms of the same hotel. No services were furnished by the lessors. The average rental paid by the Government for the hotels, which included "good, bad and indifferent", was approximately 61 cents per day per room. 71. The hotel in Tampa most nearly comparable to the Floridan is the Tampa Terrace Hotel, which has approximately 190 rooms. Pickard, acting as a director of the corporation which owned the Tampa Terrace, signed the minutes of a meeting of the directors on September 1, 1943, which recite that the Tampa *454 Terrace was being rented for $72,000 a year. 72. On the basis of a lease from year to year with the lessor to bear the depreciation on building and fixtures, to pay taxes, fire and windstorm insurance and to make structural and exterior repairs and the lessee to pay all operating costs, licenses, elevator and liability insurance, make interior repairs, and bear the cost of necessary replacements to fixtures, and without a minimum guaranteed rental, the Floridan had a fair rental value for the fiscal years ended March 31, 1944, March 31, 1945 and March 31, 1946, equal to 25 per cent of gross receipts from the operations of the respective fiscal years, and had a fair rental value for the fiscal year ended March 31, 1947 equal to 20 per cent of gross receipts from the operations of that fiscal year. 73. The respondent has determined deficiencies in the petitioner's income tax, declared value excess profits tax and excess profits tax as follows for the years indicated: Declared Value
Docket
Fiscal Year
Income
Excess
Excess
No.
Ended
Tax
Profits Tax
Profits Tax
24426
March 31, 1944
$ 432.85
$19,389.86
$126,745.14
March 31, 1945
1,674.68
18,667.42
111,898.93
March 31, 1946
10,859.01
10,354.23
54,001.69
27033
March 31, 1947
17,000.90
*455 74. The following is a statement of the amounts deducted by the petitioner in its income tax returns for the indicated years as rent for the use and occupancy of the Floridan Hotel: Fiscal Year
Deduction
Ended
for Rent
March 31, 1944
$ 312,681.34
March 31, 1945
312,237.15
March 31, 1946
245,773.74
March 31, 1947
190,128.16
Total
$1,060,820.39
75. In determining the deficiencies for the fiscal years ended March 31, 1944 through March 31, 1947, the respondent allowed $150,000 of the deduction taken each year for rent and disallowed the portion of the deduction on excess of that amount. Of the payments made for the fiscal years ended March 31, 1944, 1945 and 1946, by the petitioner to the twelve owners of the Floridan Hotel, the following amounts represented the rental paid for the possession and use of the hotel by the petitioner in its business: Fiscal year ended March 31, 1944, $218,146.15; fiscal year ended March 31, 1945, $244,414.62; fiscal year ended March 31, 1946, $241,286.53. The excess of the total amounts paid over and above the rent as found and set forth represented a distribution of the petitioner's earnings and profits to its nominees *456 or designees, or those of its stockholders. For the fiscal year ended March 31, 1947, the full amount, $190,128.16, paid by the petitioner to the twelve owners of the Floridan Hotel as rent, was in truth and in fact rent. Opinion By agreement of the parties, these proceedings were heard by a Commissioner of the Tax Court, in accordance with section 1114 of the Internal Revenue Code and Rule 48 of the Court's Rules of Practice. In conformity therewith, the Commissioner prepared detailed proposed findings of fact, to certain of which the parties filed exceptions. After careful consideration of the exceptions and the arguments made thereon, we are satisfied that the proposed findings of the Commissioner are in accord and in harmony with the evidence of record. Accordingly, the proposed findings have been adopted in full. There is no issue here as to the ownership of the hotel property. The respondent recognizes the sons, daughters, son-in-law, and wives of employees and business associates of Cone, Smith and Manly as the owners of the said properties, but has determined that substantial portions of the amounts paid by the petitioner to them during the fiscal *457 years ended March 31, 1944 to 1947, inclusive, under or pursuant to the lease, agreement, or writing of May 8, 1943, are not allowable rent deductions in arriving at the petitioner's net income for the years in question, his position being that the portions of the claimed deductions disallowed by him did not constitute or represent payments of rent, but distributions by the petitioner of its earnings and profits, which are not deductible under the statute. To the extent that the payments in question did in truth and in fact represent payments for the continued use and possession of the hotel properties by the petitioner in its business, they were rent and are deductible under section 23 (a) (1) (A) of the Internal Revenue Code, [1] and any disallowance thereof by the respondent would be error. Stanley Imerman, 7 T.C. 130. To the extent, however, that the payments did not represent the payment of rent but a distribution of profits to nominees or designees of the petitioner or its stockholders, the payments are not deductible and the respondent's determination should be sustained. Limericks, Inc. v. Commissioner, 165 Fed. (2d) 483, *458 affirming 7 T.C. 1129; Stanwick's Inc. v. Commissioner, 15 T.C. 556, affd., 190 Fed. (2d) 84; and Roland P. Place, 17 T.C. 199, affd., 199 Fed. (2d) 373. On the evidence of record, we have found and determined that in part the payments in question did not represent rent paid for the continued use and possession of the hotel properties by the petitioner in the operation of its business, but, to the contrary, represented a distribution by petitioner of its earnings and profits *459 to nominees or designees chosen by it or its stockholders. The picture presented would not, in our opinion, permit any other conclusion. The transaction or transactions which brought about and effected the purchase of the hotel property and resulted in the creation of petitioner were conducted or dominated by three individuals, Cone, Smith and Manly. They had been approached as prospective buyers of the hotel, and became convinced that, at the price for which it could be acquired, its purchase and operation thereafter would be very profitable. Their personal incomes were already of such magnitude that the high rates at which additional income would be taxed to them rendered direct purchase and operation of the hotel unattractive. Being unwilling to see the opportunity pass, however, they discussed the matter with tax consultants as to ways and means of acquiring and operating the property so as to avoid the heavy income tax burden to which the earnings would be subjected if they acquired the hotel for themselves. Out of these discussions came the plan for the acquisition of the hotel property by the twelve relatives and friends. The purchase of the hotel, however, was only part *460 of the venture. It was at all times intended that the property, when acquired, would be operated as a hotel, and the anticipated profits from its operations, as distinguished from the return that might be anticipated from the owning and holding of the property as an investment, constituted a major, if not the major objective. In fact, it was envisioned that complete payment of the purchase price, except possibly for the down payment, could be made in a very few years from the profits which would flow from the ownership and operation of the hotel. It was patently obvious that the purchasers were in no position to assume direct operation of the property themselves, and while there is testimony to the effect that a proposal was made that they employ Pickard to manage and operate the property for their own account, the proposal was rejected and, so far as appears, never approached any likelihood of consummation. The problem of operating the hotel or working out a plan of operation was never passed to the purchasers, but, to the contrary, was retained and worked out by or at the instigation of Cone, Smith, Manly, Flom and Taylor. Flom and Taylor, as shown by the facts, were close business *461 friends of one or more of the first three, and had become interested in the venture by reason of the acquisition of interests in the hotel property for or by their wives. These five, [2] together with Pickard and the lawyers and tax advisers of Cone, Smith and Manly, brought about the creation of the petitioner and the drafting and execution of the lease, writing, or operating agreement of May 8, 1943. The twelve owners had little, if anything, to do with the matter other than to acquiesce therein and sign the agreement. *462 The petitioner admits that the making of the lease, contract, or operating agreement between it and the owners was not an arm's-length transaction, and if we follow the discussion correctly, there is at least passive acquiescence in the proposition that under an orthodox or typical hotel lease the amounts paid by the petitioner as rent might or would be regarded as excessive. It argues, however, that the agreement was not a typical hotel lease, but more in the nature of a management contract, and that even though not at arms' length, it was fair, and being fair, the respondent's disallowance of parts of the claimed deductions should be rejected in toto. It is said that what the owners purchased and acquired was not only the hotel properties, but a going business, with Pickard as manager, and that the petitioner, in effect, took over the management of the business for them. It is to be noted, however, that while the twelve purchasers did acquire hotel properties in which a going hotel business was being operated, they at no time took over or became the operators of that business. By specific provision in the lease, the acquisition or taking over of the operating business by the petitioner *463 was made to coincide by hour, day and year with the acquisition of the hotel property itself by the twelve purchasers. The facts do show that Pickard continued as manager and that practically all of the problems of management and operation were considered and determined by him. He did not, however, perform these functions and duties as a manager for the owners, but as an officer and employee of the petitioner. The owners were not obligated to pay any part of Pickard's salary or other compensation. His responsibility as an officer and employee was to petitioner and his only obligation to the owners was such as flowed to them under the lease, contract, or writing, or whatever it may be termed, which they had with the petitioner. Whatever the contract or agreement may be called, the provisions thereof tell their own story. By that contract, the petitioner agreed to take over the operating business, at its own expense, risk and responsibility. For the use and possession of the hotel in its operations, it was to pay "rent" in an amount equivalent to a percentage of its gross profits and, in so far as the lease or contract was concerned, the payment thereof was required, whether or not *464 the venture resulted in a profit to the petitioner. It was required to pay all bills and charges incurred in such operations and there was no provision which obligated the owners of the properties to contribute thereto even though the operations might result in a loss, but to the contrary, it was specifically provided that the leased premises and personal property should not be subject to any lien or liability for the payment thereof. The lessors, on the other hand, were to have a lien for the payment of the rent on all goods, chattels, furniture, fixtures and equipment of the lessee, which might be put on the leased premises during the term of the lease. The lessee was to procure and pay all licenses required by any authority for the operation of the hotel and was to pay all taxes levied or assessed against all personal property of the lessee used in the operations, including supplies, if any. At its own expense, the petitioner was to meet and comply with all legal requirements, ordinances, etc., of the City of Tampa, boards of health, or laws of Florida or the United States, relating to the occupation and use of the leased premises, improvements thereon, personal property, additions *465 thereto, or business carried on thereon. It was to keep in good condition and repair all linens, china, glass and silverware and to replace any of such articles as might be broken, damaged or worn beyond repair, or lost or stolen, and at the termination of the lease, deliver to the lessors all of said articles, with replacements, in as good condition as when received. All other personal property was to be maintained in the same condition as when received, fair wear and tear excepted. The hotel premises were likewise to be kept and maintained by the petitioner at its own expense, and returned to the owners at the expiration of the lease in the same condition as when received, fair wear and tear excluded. The petitioner was also to keep and maintain the premises in a reasonably safe condition for its operation as a hotel and to hold the lessors harmless for any loss, damage or injury to person or property during the term of the lease. It agreed to carry at its own expense public liability insurance on the premises and elevators therein. It was not to suffer or permit any lien to arise or be created against the lessors' interests in the leased premises or against the lessors' personal *466 property, all of which was to be returned to the lessors at the expiration of the lease free and clear from any and all liens or encumbrances of any kind or character whatsoever. The lessors were not to be accountable for defects, latent or patent, which then existed or might thereafter develop in the building or in the elevators, machinery, equipment, furniture, fixtures, or other personal property covered by the lease, and were to be held harmless by petitioner for any injuries sustained by any person or persons by reason of any such defects. Under such an arrangement it may not, in our opinion, be denied that the petitioner was to operate and conduct the hotel business as principal, not as manager or agent of the lessors. From the start, Cone, Smith and Manly, joined later by Flom and Taylor, had concerned themselves with the devising of some method whereby they might acquire the hotel property and bring about its operation in such manner as to pass the profits flowing from the ownership and operation of the hotel to relatives and friends free of the tax burden which such profits would have to bear if they themselves were the principals. That they accomplished that purpose as *467 to the profits flowing from the ownership of the hotel property was conceded by the respondent in his allowance to the petitioner of substantial portions of the rent deductions claimed, and if they had allowed or permitted the twelve purchasers to take over the operating business or have it taken over and operated for their own account, there would have been no apparent basis for a case such as we have here. For their own reasons, however, they chose to create the petitioner and make it, at its own risk and responsibility, the proprietor of thehotel operating business. Such being the case, it may not escape tax on its earnings and profits by paying those earnings and profits to the owners under the guise of rent. Lucas v. Earl, 281 U.S. 111. It is, of course, perfectly fitting and proper for a taxpayer to conduct its business in such manner as to subject it to a minimum of tax. The transactions indulged in must be realistic, however, and the earnings and profits of a taxpayer may not escape their just and proper tax burden under the law, by being made to appear what they are *468 not. In the instant case, the twelve owners were, for all practical purposes, passive investors in the hotel. As such, they were entitled to receive a fair and proper amount as rent from any party having the use and possession thereof for the conduct of a hotel business therein. On the other hand, it would be a wholly unrealistic arrangement that would require the operators also to pay their operating profits to the owners, in addition to a fair and just rental. And while it may generally be taken for granted that parties dealing at arm's length will arrive at a fair and proper amount to be paid as rent to the owners of property for the possession and use thereof by the other party in its business, there was, in the instant case, no fixing in an arm's-length transaction of the rent to be paid. The petitioner does not contend otherwise, but argues that, even so, the amounts paid were reasonable and, such being the case, the issue here should be resolved as if the contract had been an arm's-length transaction. The question then is one of fact and is whether the payments made as "rent" were reasonable as such, and therefore deductible, and if not, to what extent were they excessive, and *469 in effect distributions of the petitioners' earnings and profits, which are not deductible. From the evidence, we have determined and factually found the portions of the payments here in issue which reasonably constituted the rental paid by the petitioner for the possession and use of the hotel properties in the conduct of its business, and little, if any, further comment is really necessary. In passing, however, it may be helpful to point to one or two of the background facts and circumstances which indicate that considerations other than a determination at arm's length of a fair rental had a controlling effect in fixing the amounts petitioner was to pay as rent. It is true that Cone, Smith, Manly, Flom and Taylor did place the drafting of the agreement in the hands of others and it was the testimony of those individuals that they attempted to draw up a fair agreement as between the parties, but because of the income tax aspects of the situation, there was always present in their deliberations the desire and wish of the individuals named above not to profit to any substantial extent from the acquisition and operation of the hotel. In short, a determination of what might have been *470 fair between parties dealing at arm's length was at all times qualified, to a substantial extent, by what the five named individuals desired to have accomplished, namely, the by-passing of the tax, in steering the profits of the venture to the twelve relatives and friends. There was, accordingly, no independent or arm's-length resistance to having the "rental" absorb substantially all of the profits which might remain after other costs and expenses had been paid. As some indication that such was a primary objective, rather than an arm's-length prospective determination of a fair and reasonable rental, it is to be noted that thereafter, when necessary to keep the "rental" payments in line with petitioner's operating profits, the payments were not computed and made at the rates appearing in the contract, at the beginning of the year, but at rates worked out by Pickard, after some six or eight months of operations had given some reasonable indication of what the petitioner's operating profits for the year, but before the payment of "rent," would be. A further noticeable fact is the variation between the computations for fixing the fairly constant annual profits the petitioner was ultimately *471 allowed to retain and those in arriving at the profits which supplied the basis for Pickard's bonuses. It was Pickard's testimony that for the years 1944 through 1946, the bonuses received by him were computed at 20 per cent of the petitioner's net operating profits, while as to 1947, the percentage applied was adjusted upward. The bonuses received by him for the respective years were $5,709.97, $5,047.34, $6,077.37 and $7,495.31, while the net income reported by the petitioner for those years, after allowing for the said bonuses, was $11,150.85, $8,300.35, $11,610.06 and $19,898.24, respectively. While this difference is not explained by the petitioner, the answer is apparently to be found in the bookkeeping treatment of the cost of the new cocktail lounge which proved so profitable in the operations of the hotel. Apparently the cost of the lounge was treated as that of petitioner and in fixing and arriving at petitioner's ultimate annual profits and net income, such cost was spread over the tax years before us as amortization of building improvements, under the heading "other expenses," while in determining net profits for the purpose of computing Pickard's bonuses, all such charges *472 were seemingly omitted. These are some of the circumstances which, in our opinion, indicate the unreality of the petitioner's claim. To the extent the payments here in issue are shown by our findings to have been a payment of rent, they constitute allowable deductions. The excess not being rent but a distribution of earnings and profits, the respondent's disallowance thereof is sustained. Decisions will be entered under Rule 50. Footnotes
1. SEC. 23. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: (a) Expenses. - (1) Trade or Business Expenses. - (A) In General. - All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including * * * rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, or property to which the taxpayer has not taken or is not taking title or in which he has no equity.↩
2. Of petitioner's 180 shares of stock, 105 shares were acquired by Cone, Smith and Manly. Pickard acquired 10 shares, and the remaining 65 shares were subscribed for by other individuals. None was acquired by any of the twelve owners. The facts show, however, that Manly paid for the 10 shares subscribed for by Lassiter, a friend of his, and that shortly thereafter the shares were assigned to Manly. Wilson, who acquired 15 shares, was an employee of Smith. Flom and Taylor paid for the 30 shares subscribed for by Boggs, from whom they received notes covering the advances. The notes were later canceled at Boggs' request and the shares were transferred to Flom and Taylor. Petitioner's officers were Cone, Smith, Manly, Pickard and Flom. Its directors were Smith, Cone, Manly, Taylor and Flom.↩